

FILED

OCT 10 2012

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re                                          Case No. 12-12050-A-12
                                               DC No. DKE-1
ANTONIO PEREIRA CABRAL, and
MARIA BEATRIZ CABRAL,

                Debtors.
_____/

**MEMORANDUM DECISION REGARDING MOTION TO DISMISS
CHAPTER 12 CASE FOR CAUSE**

Thomas O. Gillis, Esq., appeared on behalf of the debtors Antonio and Maria Cabral. David K. Eldan, Esq., appeared on behalf of the secured creditor Bank of America, N.A.

Before the court is a motion by the secured creditor Bank of America, N.A., (the "Bank") to dismiss the present case filed by the debtors Antonio and Maria Cabral (the "Debtors") for cause under 11 U.S.C. § 1208(c)[1] (the "Motion"). One month after voluntarily dismissing their prior chapter 12 case, where a plan of reorganization had been confirmed over the Bank's objections, the Debtors filed the present bankruptcy case, which the Bank contends is a bad faith filing. After holding a hearing on the matter where both parties presented oral arguments, the court took the matter under submission on September 18, 2012. For the reasons set forth below,

---

[1] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, as enacted and promulgated after October 17, 2005, the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Pub. L. No. 109-8, 119 Stat. 23 (enacted Apr. 20, 2005).

the court finds that such cause exists and that dismissal of the Debtors' second filing is appropriate under the circumstances.[2]

## I.    FACTUAL AND PROCEDURAL BACKGROUND.

The Debtors operate a dairy.  Prior to their bankruptcies, the Debtors had entered into several loans with the Bank, each secured by some property owned by the Debtors.  The first was a $1,200,000 term loan for which the Debtors' real property located in Madera, California (the "Real Property") served as collateral.  This loan also incorporated an interest rate swap agreement,[3]  which constituted a separate obligation from the loan.  The other loans were a $649,000 term loan, a $100,000 term loan, and a $300,000 line of credit.  For these three loans, the Bank had a blanket lien against most of the Debtors' personal property, including livestock, receivables, inventory, and equipment (the "Personal Property").

### A.  The Debtors' First Chapter 12 Case.

The Debtors filed their first petition under chapter 12 on August 4, 2010 (the "First Case").[4]  After unsuccessfully proposing multiple plans of reorganization, each met with objections from creditors and the court, the Debtors filed their third modified plan on March 17, 2011 (the "First Plan").  Under this plan, the Debtors intended to treat all of the Bank's secured claims as fully secured[5] and to continue making the contractual monthly payments to the Bank pursuant to the swap agreement.

Part of the First Plan read, "Creditors whose claims are set forth in Exhibit A(2) hereto

---

[2] This memorandum decision contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), as made applicable to this contested matter by Federal Rules of Bankruptcy Procedure 7052 and 9014(c).

[3] An understanding of interest rate swaps is unnecessary for purposes of this decision. Nevertheless, a brief explanation about them may be found at *Thrifty Oil Co. v. Bank of America National Trust & Savings Ass'n*, 322 F.3d 1039 (9th Cir. 2002).

[4] *In re Cabral (I)*, Case No. 10-18874-A-12 (Bankr. E.D. Cal. filed Aug. 4, 2010).

[5] Although this was the Debtors' general intent, the First Plan's treatment of the Bank's secured claims did, in fact, bifurcate two of those claims, albeit the resulting amount of the unsecured claims were inconsequential.

2

upon due filing and allowance shall be allowed as secured claims in the amount of the value of the security shown." Exhibit A(2) was intended to identify all of the secured claims and their treatment. As to the Bank's claims, the exhibit, in relevant part, provided the following:[6]

| Claimant | Total Amount of Claim | Security (Nature) | Security (Value) | Secured Portion to Be Paid |
|---|---|---|---|---|
| Bank of America | $1,151,648.96 | First Deed of Trust | $1,151,648.00 | $1,151,648.00 |
| Bank of America[7] | [left blank] | First Deed of Trust | $1,151,648.00 | [left blank] |
| Bank of America | $300,374.68 | UCC-1 Cows, A/R, Inventory, Retains, Equipment, USDA Guarantee | $300,374.68 | $300,374.68 |
| Bank of America | $493,072.39 | UCC-1 Cows, A/R, Inventory, Retains, Equipment, USDA Guarantee | $493,072.39 | $493,072.39 |
| Bank of America | $75,590.00 | UCC-1 Cows, A/R, Inventory, Retains, Equipment | $72,593.19 | $72,593.19 |

The First Plan drew a number of objections from the Bank, mainly on the grounds that the plan was not feasible, but the court ultimately entered an order confirming the First Plan on July 7, 2011. With their then-confirmed plan, the Debtors were obligated to make $20,000 monthly payments, consisting of $16,000 paid to the chapter 12 trustee under the plan and $4,000 paid to the Bank outside the plan pursuant to the swap agreement. However, this did not represent all of the Debtors' payment obligations under the First Plan.

Though the court overruled most of the Bank's objections, it did sustain one pertaining to the Debtors' repeated defaults under a prior cash collateral order, which had been previously entered by the court on October 15, 2010. Under this order, the Debtors were required to make monthly adequate protection payments to the Bank consisting of interest, fees, and expenses.

---

[6] Exhibit A(2) to Third Modified Debtor's Chapter 12 Plan at 7–8, *In re Cabral (I)*, Case No. 10-18874-A-12 (Bankr. E.D. Cal. 2010), ECF No. 87.

[7] This was intended to account for the obligation under the interest rate swap agreement.

Each month's payment was roughly $7,000, with the court mandating that such payments begin retroactively in September 2010 and continue each month until ordered otherwise.

However, the Debtors did not comply with the order and failed to make the required payments from September 2010 to April 2011.[8] As a result, the court decreed, as part of the confirmation order, that the Debtors cure these defaults within three months by October 7, 2011. The outstanding amount owed under the cash collateral order then totaled $47,137.80, and the Debtors had to make these cure payments in addition to their regular $20,000 plan payments.

Because of their more pressing obligation to cure, the Debtors immediately defaulted under the plan. In the first three months after confirmation, they appeared to have dedicated all income to making the necessary cure payments by the deadline. As a result, the Debtors did not make any of their $16,000 monthly plan payments for July, August, and September.

To explain the Debtors' inability to perform under the First Plan from their perspective, the debtor Antonio Cabral offered the following account in one of his declarations (the "Declaration"):[9]

6. Those additional payments were a back breaker for my plan.

7. By paying $38,333 per month, I could not afford to provide the cows the feed necessary for the normal production of milk.

8. Consequently, I had to accelerate my silage use for feeding the cows. I exhausted my silage in January instead of it lasting until a new crop could be harvested in April or May 2012.

9. After my silage ran out, I was not able to feed properly and milk production dropped.

10. My farm relies on the help of my three adult sons. After confirmation, unexpectedly one of my sons got a better job and left the dairy. About the same time, another son got a serious injury while participating in a bull fight. He was unable to work for about two months. Without my workers, I could not do a good job on the dairy and farm.

11. All of the above events were unanticipated.

---

[8] The Debtors appeared to have made a single payment of $7,634.34 in November of 2010.

[9] Declaration of Debtor in Support of Response to Bank of America's Motion to Dismiss at 2–3, *In re Cabral (II)*, Case No. 12-12050-A-12 (Bankr. E.D. Cal. 2012), ECF No. 106.

4

During a failed attempt at proposing a post-confirmation, modified plan in the First Case,[10] the Debtors decided to hire new counsel. They filed a motion on January 30, 2012 to substitute their counsel, Henry Nunez, who had, until then, represented them throughout the duration of the First Case. Before the court entered an order approving the substitution, the Debtors' new counsel, Thomas Gillis, filed on behalf of the Debtors a motion to dismiss chapter 12 case, exercising their absolute right to dismiss their case under § 1208(b). The court then dismissed the case on February 7, 2011.

B.  The Debtors' Second Chapter 12 Case.

Roughly one month after the voluntary dismissal of their First Case, the Debtors filed a second petition under chapter 12 on March 8, 2012 (the "Second Case"). According to the Debtors, the reason for their second filing was to "strip liens and eliminate the [s]wap agreement with [the] Bank,"[11] something that had not been proposed in the First Plan.

Just before the ninety-day deadline under § 1221, the Debtors filed a new plan of reorganization on June 6, 2012 (the "Second Plan"). Unlike in the First Case, the Debtors in the second filed motions to value their Real Property and Personal Property in order to bifurcate any of the Bank's undersecured claims. In conjunction with these motions, they proposed in the Second Plan to strip down and off any unsecured portion of the Bank's liens based on their new, lower valuations.

The Debtors now valued the Real Property at $1,100,000. As to the Personal Property, the Debtors valued the livestock at $509,421 and the rest of the Personal Property at $99,967, the sum of the two being $609,388.

Due to the proposed treatment of the Bank's claims in the Second Plan, which deviated from their treatment under the now-vacated First Plan, the Bank objected to each of the Debtors'

---

[10] The Debtors moved to modify their plan on October 26, 2011, which was met with an objection from the Bank. At the first hearing on modification, the court continued the hearing to the next month. After unsuccessfully requesting another continuance, the Debtors withdrew their motion to modify at the January 26, 2012.

[11] Debtor's Response to Bank of America's Motion to Dismiss at 9, *In re Cabral (II)*, Case No. 12-12050-A-12 (Bankr. E.D. Cal. 2012), ECF No. 105.

5

motions to value and to confirmation of the Second Plan. Along with these objections, the Bank filed this present Motion, requesting dismissal for cause based on the Second Case being filed in bad faith. The Debtors then filed a response to the Motion, and the Bank filed a reply. After both parties presented oral arguments at the hearing, the matter was deemed submitted on September 18, 2012.

## II.  JURISDICTION.

The court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. § 1208, and General Order Nos. 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A). Venue is proper under 28 U.S.C. § 1409.

## III. DISCUSSION.

### A.  Evidentiary Objection to the Declaration of Antonio Cabral.

Before evaluating the merits of the Motion, the court considers the Bank's evidentiary objection to the debtor Antonio Cabral's Declaration filed in support of the Debtors' response to the Motion. In the Declaration, the debtor stated that he "cannot read English," speaks only Portuguese, and had difficulty understanding his former, non-Portuguese-speaking counsel. Declaration of Debtor in Support of Response to Bank of America's Motion to Dismiss at 1, *In re Cabral (II)*, Case No. 12-12050-A-12 (Bankr. E.D. Cal. 2012), ECF No. 106. The Declaration failed to provide whether the contents had been translated to the debtor prior to him signing it. The Bank therefore argues that Antonio Cabral lacked the competency to attest to the truthfulness and correctness of the facts stated in the Declaration.

In response, the Debtors filed a declaration from Joe Bento, an employee of Debtors' present counsel, who stated in the declaration that he was "fluent in the Portuguese language" and that he "personally translated and explained each and every declaration signed by the Debtor [Antonio Cabral] in this case." Declaration of Joe Bento in Opposition to Motion to Dismiss at 1, *In re Cabral (II)*, Case No. 12-12050-A-12 (Bankr. E.D. Cal. 2012), ECF No. 118. With this additional declaration, the Debtors contend that they have now laid the proper foundation to admit the Declaration as evidence. However, the court disagrees.

6

Under the Federal Rules of Evidence, only a competent person may testify as a witness in a bankruptcy proceeding. *See* Fed. R. Evid. 601, *incorporated by* Fed. R. Bankr. P. 9017. "Competence refers to the condition of the witness at the time he or she is called to testify." *Kline v. Ford Motor Co.*, 523 F.2d 1067, 1069 (9th Cir. 1975). It would follow that a non-English speaking or reading witness is not competent to understand and verify statements written in English. Because Antonio Cabral "cannot read English" and probably cannot write in English, he most likely did not write the Declaration or, if written by someone else, he did understand its contents without proper translation.

Though a declaration from a translator could lay the necessary foundation, Joe Bento's declaration is still insufficient in this case. While he stated that he translated the contents of the Declaration, his declaration failed to provide for *when* such translations were communicated to the debtor. Without these facts, the court does not know whether Antonio Cabral received a translation before signing the Declaration, and as a result, whether he understood its contents before signing. It is possible that Joe Bento provided the translation *after*, as an attempt to cure the deficiencies in the Declaration. Additionally, Antonio Cabral did not state in his Declaration or in a supplemental one that he, in fact, had received a translation. *See Matsuda v. Wada*, 101 F. Supp. 2d 1315, 1323 (D. Haw. 1999) (admitting declaration where declarant later stated in deposition that the signed declaration had been translated to him).

Therefore, the court finds it proper to sustain the Bank's evidentiary objection as to the Declaration of the debtor Antonio Cabral.

B. Dismissal for Cause Under § 1208(c).

Similar to chapter 11 and 13 cases, a case filed under chapter 12 may be dismissed for "cause." *Compare* § 1208(c), *with* § 1112(b), *and* § 1307(c). Such cause for dismissal includes a petition filed in bad faith. *Eisen v. Curry (In re Eisen)*, 14 F.3d 469, 470 (9th Cir. 1994) (per curiam) (chapter 13 case). "To determine if a petition has been filed in bad faith the courts are guided by the standards used to evaluate whether a plan has been proposed in bad faith." *Id.*

Serial filings are not considered to be per se bad faith. *See Downey Sav. & Loan Ass'n v. Metz (In re Metz)*, 820 F.2d 1495, 1497 (9th Cir. 1987); *see also Johnson v. Home State Bank*,

7

501 U.S. 78, 87 (1991) (permitting serial filings under chapter 7 and then chapter 13). Instead, the court must review the totality of the circumstances to determine the issue of bad faith. *In re Metz*, 820 F.2d at 1498 (citing *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1391 (9th Cir. 1982)). For guidance, the court may consider four factors: (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Bankruptcy Code, or otherwise filed his petition or plan in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor only intended to defeat state court litigation; and (4) whether egregious behavior is present. *In re Leavitt*, 171 F.3d 1219, 1224 (9th Cir. 1999) (citations omitted) (internal quotation marks omitted). In the context of serial filings, the totality of the circumstances requires that the filings "be examined together and the result achieved by such filings reviewed against the statutory requirements." *In re Metz*, 820 F.3d at 1497.

### 1. The BAP's Decision in *In re Caviata Attached Homes.*

Most recently, the Bankruptcy Appellate Panel for the Ninth Circuit (the "BAP") considered whether there was cause to dismiss a second chapter 11 case where the debtor had filed that case after being unable to perform under its plan confirmed in its first chapter 11 case. *In re Caviata Attached Homes, LLC*, -- B.R. --, 2012 WL 3002573, at *11 (B.A.P. 9th Cir. July 17, 2012). In *Caviata Attached Homes*, the debtor confirmed a plan in which it proposed to either sell or refinance certain property in order to pay its major secured creditor's claim in full within three years of confirmation. *Id.* at *4. Post-confirmation, the debtor experienced difficulty in trying to sell and refinance the property due to the continuing poor conditions in the real estate and lending markets brought on by the recession. *Id.* at *5.

The debtor then filed a second petition fifteen months after confirmation in order to propose a new plan that essentially "modified" the prior, confirmed plan by extending the three-year deadline to ten years. *Id.* at *4–5. Since the plan had been "substantially consummated" at that point,[12] the debtor acknowledged that it was prohibited from modifying the

---

[12] Section 1127(b) of the Code provides that "[t]he proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan." Section 1101(2), in turn, defines "substantial consummation."

8

plan in the first case. *Id.* at *5, *11 n.10. Shortly after the second petition date, the secured creditor filed a motion to dismiss, where it "contended the second filing was a bad faith filing and a backdoor attempt to circumvent the prohibition on modifying a substantially consummated plan under § 1127." *Id.* at *5. The BAP ultimately concluded that there was "cause" to dismiss based on the debtor's "inability to show an extraordinary change in circumstances which substantially impaired its performance under the First Plan to warrant the second chapter 11 filing." *Id.* at *15.

Though the BAP ruled on a different but related ground than what was advanced by the secured creditor, implicit in the *Caviata Attached Homes* decision is the general principle that where debtors file a second case in order to propose a plan that they would have otherwise been prohibited from proposing in their first case by plan modification, the second case may nevertheless be dismissed for cause.[13] And while the BAP was faced with successive *chapter 11* filings, its reasoning is nevertheless applicable to cases under other chapters involving plans of reorganization, which includes the present case filed under chapter 12. *Cf. In re Benafel*, 461 B.R. 581, 585 (B.A.P. 9th Cir. 2011) (adopting in chapter 13 case the analysis set forth in prior decision involving chapter 11 case).

## 2. A Second Petition May Be Evidence of Bad Faith.

Similar to chapter 11 and chapter 13 plans, a confirmed plan in a chapter 12 case is binding on the parties. *See* § 1227(a). This simply means "that the plan is a contract between the debtor and the debtor's creditors." *Max Recovery, Inc. v. Than (In re Than)*, 215 B.R. 430, 435 (B.A.P. 9th Cir. 1997) (chapter 13 case). In addition to the statutory binding effect, a confirmation order also means that all questions that were or could have been raised pertaining to the plan are entitled to res judicata effect. *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir. 2004) (chapter 11 case). Such preclusive effect reaffirms "the well-settled policy recognizing the

---

[13] The general principle is evidenced by the BAP recognizing that the "good faith" exception did not apply in that case and then affirming the dismissal, though the panel did not make a finding of bad faith.

finality of confirmation orders." *In re Pardee*, 193 F.3d 1083, 1087 (9th Cir. 1999) (chapter 13 case).  However, when a case is dismissed, the parties are no longer "bound by the terms of the . . . confirmed plan . . . [because] [t]he dismissal effectively vacated the . . . confirmed plan." *Nash v. Kester (In re Nash)*, 765 F.2d 1410, 1413 (9th Cir. 1985) (chapter 13 case).

In this case, the Debtors voluntarily dismissed their First Case, which effectively vacated their First Plan and they were no longer bound by the provisions contained therein.  Arguably, it follows that, with a second filed petition, the Debtors may operate on a clean slate and propose an entirely new plan without being concerned about any binding or preclusive effect from the now-vacated First Plan.

Yet, although the filing of a second petition or the proposal of a second plan may otherwise meet the statutory requirements, "the [filing] or plan may nevertheless violate the purpose and spirit of chapter [12] and thus not be [filed or] submitted in good faith." *In re Metz*, 820 F.2d at 1498; *see also In re Nash*, 765 F.2d at 1415 (stating that debtors "may file successive . . . plans as long as each new plan is proposed in good faith").  As stated above, lack of good faith may be shown through the manipulation of the Bankruptcy Code.  *See In re Goeb*, 675 F.2d at 1390.

This court believes that such manipulation may exist when debtors files a second case primarily to propose some action in the second case (and second plan) that was otherwise prohibited or unavailable to the debtors during the first case.  *See In re Caviata Attached Homes*, 2012 WL 30032573, at *11; *cf. In re Tran*, 431 B.R. 230, 237 (Bankr. N.D. Cal. 2010) (finding bad faith in chapter 20 context) ("[T]he totality of the circumstances shows that [the debtor] filed this chapter 13 case solely for purposes of avoiding the second deed of trust under circumstances where such avoidance was not available to her in chapter 7, and where no independent reason exists for her subsequent chapter 13 filing."), *aff'd*, 814 F. Supp. 2d 946 (N.D. Cal. 2011).  Such manipulation is particularly apparent when the debtors had previously exercised their absolute right to dismiss their prior case.  *Cf.* § 109(g)(2) (imposing 180-day refiling bar for any debtor who "requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by [§ 362]").

Because the debtor in *Caviata Attached Homes* could not have modified its substantially consummated plan during the first case, the debtor attempted to "modify" its plan by filing the second case and proposing a new plan. This was not allowed. Thus, to determine whether the Second Case constitutes a bad faith filing, this court must look first to the plan "modifications" proposed in the Second Case (i.e., the plan provisions in the Second Plan that diverge from those in the First Plan relating to treatment of the Bank's claims). The court will then determine whether these "modifications" would have been allowed through plan modification under § 1229 during the First Case or whether they would have been barred by res judicata. If the latter is the case and the second filing appears to be an attempt to circumvent the preclusive effect of the confirmed First Plan, then that may establish strong indicia of a petition filed in bad faith.

    a. *The Debtors' Proposed "Modifications" Relate to Valuation of the Bank's Collateral and Bifurcation of the Bank's Claims.*

The court will first identify what "modifications" have been proposed in the Second Plan, meaning the material provisions that differ from their counterparts found in the First Plan. As both parties have acknowledged, the "modifications" relevant to this discussion relate to the treatment of the Bank's secured claims and the valuations of the Bank's collateral.

In the First Case, the Debtors had valued the Bank's collateral to allow the Bank to maintain nearly the full amount of its secured claims. The court notes that the assertion that the Debtors never conducted § 506(a) valuations in the First Case is somewhat flawed. While true that the Debtors never filed *separate motions* to value like in the Second Case under Rule 3012, the Debtors nevertheless provided valuations—albeit through the *plan*. Indeed, this was proper as a plan may value collateral (and thus a creditor's secured claim) as long as the creditor receives adequate notice that the plan will do so. *See In re Shook*, 278 B.R. 815, 824, 829 (B.A.P. 9th Cir. 2002) (emphasizing the need for due process).

Here, the First Plan—specifically, Exhibit A(2) of the plan—provided the values of the Bank's collateral. For the Real Property securing one of the Bank's loans, the plan valued this at "$1,151,648.00," ninety-six cents less than the amount listed for the Bank's claim of "$1,151,648.96." As to Personal Property securing the Bank's other loans, the Debtors had

11

essentially provided the aggregate value of this collateral at $866,040.26,[14] a figure only $3,000 less than the aggregate amount of the Bank's claims securing the Personal Property.[15]

In contrast, under the proposed Second Plan, the Debtors wish to value the Bank's collateral at substantially lower figures and to strip down or off any of the Bank's partially and completely undersecured liens accordingly.

The Debtors valued the Real Property at $1,100,000, an amount roughly $50,000 less than the value provided under the First Plan.[16] By setting the Real Property at this value, the Debtors intend to cram down the undersecured portion of the Bank's roughly $1,200,000 secured claim,[17] strip the Bank's completely undersecured claim based on the swap agreement,[18] and treat any unsecured amounts as general unsecured claims to be paid next to nothing. Under the First Plan, the Bank's secured claim against the Real Property remained fully secured and was to be paid in full, and payments under the swap agreement were to be made as contractually due.

---

[14] This amount is the sum of $300,374.68, $493,072.39, $72,593.19, figures provided by the Debtors in the exhibit. Although in the exhibit the Debtors separated out the Bank's three secured claims and separated out the collateral securing these claims, the Bank's claims were secured by the same personal property. Thus, the court finds it appropriate to combine those three figures to determine the total value of the collateral for purposes of this discussion.

[15] The total amount of the three claims secured by the Personal Property equals $869,037.07. This is the sum of $300,374.68, $493,072.39, and $75,590.00, figures provided by the Debtors in the exhibit.

[16] This $1,100,000 figure is based on what was provided in the Motion to Value Collateral (Credit Swap Held by Bank of America), *In re Cabral (II)*, Case No. 12-12050-A-12 (Bankr. E.D. Cal. 2012), ECF No. 15.

[17] However, there is a discrepancy in the Second Plan, as it provides that this claim would be treated as fully secured. It is unclear which is the intended treatment.

[18] There is some potential confusion by the Debtors as to whether the interest rate swap agreement represents a claim or an ongoing obligation under an executory contract. Nevertheless, the court has no need to classify the swap agreement for purposes of this discussion.

12

As to the Personal Property, the Debtors valued this collateral at $609,388,[19] approximately $250,000 less than the valuation included in the First Plan. Due to the substantial decrease in value, the Debtors proposed to strip down or off the Bank's second and third liens against the Personal Property.[20] By comparison, under the First Plan, the first two liens remained fully secured while the partially undersecured third lien was crammed down by approximately $3,000.

With these proposed "modifications" in mind, the court turns to whether such "modifications" would have been proper as part of a modified plan under § 1229 or whether res judicata would have precluded such "modifications" from being proposed post-confirmation in the First Case.

> b. *The Debtors Could Not Modify Their Plan in the First Case Under*
> *§ 1229 to Revalue Collateral.*

The court recognizes that even though a confirmed plan is intended to have a binding and preclusive effect on all parties, "[r]es judicata does not apply to the provisions sought to be modified." *In re Than*, 215 B.R. at 435 (emphasis omitted). "Modification pursuant to [§ 1229] provides a mechanism to change the binding effect of [§ 1227]." *Powers v. Savage (In re Powers)*, 202 B.R. 618, 622 (B.A.P. 9th Cir. 1996) (citing *In re Witkowski*, 16 F.3d 739, 745 (7th Cir. 1994)) (chapter 13 case).

Although § 1229 allows modification of a binding, confirmed plan, the kinds of modification permitted are fairly limited. Specifically, the debtor may modify the provisions of his confirmed plan in one of three ways:

> (1) [to] increase or reduce the amount of payments on claims of a particular class provided for by the plan;
>
> (2) [to] extend or reduce the time for such payments; or

---

[19] Once again, there is a discrepancy between the Second Plan and the relevant motion to value collateral. The plan accounts for all of the Personal Property, while the motion only seeks to value the livestock.

[20] The court is purposefully being vague in addressing the Bank's three claims secured by the Personal Property since their lien priorities are not evident from the record.

(3) [to] alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan.

§ 1229(a). Because "[§ 1229(a)] limits the kinds of modifications that can be proposed," the three modifications are intended to be exclusive. *In re Powers*, 202 B.R. at 622; *see also In re Mattson*, 468 B.R. 361, 367 (B.A.P. 9th Cir. 2012) (chapter 13 case).

Although the Debtors' proposed "modifications" would have had the effect of lowering the payment amounts on account of the Bank's claims (i.e., where the undersecured portions of the Bank's claims would be paid pennies on the dollar as general unsecured claims, rather than the Bank's entire claims being paid in full), that is not the kind of modification intended under § 1229(a)(1). What the Debtors would actually hope to achieve through "modification" (i.e., in their new plan) is a reduction in the amount of secured claims and a reclassification of claims by revaluing the Bank's collateral at lower values. *See* Debtor's Response to Bank of America's Motion to Dismiss at 9, *In re Cabral (II)*, Case No. 12-12050-A-12 (Bankr. E.D. Cal. 2012) ("In the instant case, debtor is not refusing to value Bank of America's claims . . . . The debtor in this second filing will be attempting to strip liens and eliminate the Swap agreement with Bank of America."), ECF No. 105. But this "modification" of revaluing collateral is not of a type enumerated under § 1229(a) and thus not allowed under the Code.[21]

           c. *Res Judicata Would Have Precluded the Debtors from Revaluing the Bank's Collateral in the First Case.*

As previously stated, a confirmed plan "is res judicata as to all issues that could have or should have been litigated at the confirmation hearing." *In re Pardee*, 193 F.3d at 1087 (citation omitted) (internal quotation marks omitted). The doctrine bars a party from "later complain[ing]

---

[21] As a parallel, reclassification of claims in a modified plan is generally not permitted under the Code. *See* 8 Collier on Bankruptcy ¶ 1329.04[1], at 1329-9 (16th ed. 2012) (citing *In re White*, 169 B.R. 526 (Bankr. W.D.N.Y. 1994); *In re Powell*, 15 B.R. 465 (Bankr. N.D. Ga. 1981)) (chapter 13 context); *cf. In re Eaton*, No. EC-05-1261-PaNMa, 2006 WL 6810924, at *6 n.15 (B.A.P. 9th Cir. 2006) ("[I]t is difficult to see how § 1329(a) allows the sort of drastic modification of rights occasioned by a post-confirmation lien-stripping motion when the creditors' claims had previously been allowed.") (chapter 13 case).

1  about an adverse result" stemming from the plan. *Id.* at 1086 (citation omitted) (internal

2  quotation marks omitted).

3        It follows that where modification of certain plan provisions is prohibited by the statute,

4  res judicata also acts as a bar, giving those plan provisions binding and preclusive effect. *Cf. In*

5  *re Powers*, 202 B.R. at 622 (stating that "common-law res judicata does not apply when a

6  contrary statutory purpose is evident" (citations omitted)).  Here, because § 1229(a) does not

7  expressly permit revaluing collateral through a modified plan, the Debtors' original valuations

8  stated in the confirmed First Plan would have been entitled to res judicata effect in the First Case.

9        But "a plan should clearly state its intended effect on a given issue.  Where it fails to do

10  so it may have no res judicata effect." *In re Brawders*, 325 B.R. 405, 411 (B.A.P. 9th Cir. 2005).

11  Thus, the doctrine "generally does not apply to a 'claim' that was not within the parties'

12  expectations of what was being litigated." *Id.*; *accord In re Summerville*, 361 B.R. 133, 141

13  (B.A.P. 9th Cir. 2007) ("[W]here a plan fails to state its intended effect on a given issue, any

14  ambiguity may reflect that that issue was not considered by the bankruptcy court, and/or that the

15  parties did not contemplate that the plan would resolve the issue.").

16        The Debtors believe this to be the case here.  According to them, the values provided in

17  the First Plan were not intended to represent the actual valuation of the Bank's collateral.

18  Arguably, if the issue of valuation was not contemplated at confirmation, then res judicata would

19  not have applied in the First Case, and there may be no bad faith on their part in dismissing their

20  prior case and filing the second.  They contend that the values in the First Plan were meant to

21  show that the Bank would be paid 100% on its claims.  Their argument could have prevailed if

22  no valuations were referenced at all in a granted motion to value or in the plan. *See In re Lynch*,

23  363 B.R. 101, 106 (B.A.P. 9th Cir. 2007) (concluding that order confirming chapter 13 case

24  could not have provided for implicit valuation for debtors' residence based on value stated in

25  schedules).  However, the Debtors are ignoring the plain language of their plan.

26        In Exhibit A(2) of the First Plan, the plan provided three discrete columns, one for the full

27  amount of the claim, another for the value of the collateral, and the last for the secured portion of

28  the claim.  Not every number listed in the third column matched the one listed in the first, but

every number in the third did, in fact, match the one in the second. This corresponded with the provisions of the First Plan, which set forth that creditors "shall be allowed . . . secured claims in the amount of the value of the security shown." The "value of the security" appeared in the second column, which was unambiguously labeled "Security (Value)."

If the Debtors truly intended that the Bank's secured claims would be paid in full under the Plan, then they would have omitted any reference to "Security (Value)" entirely in the plan and the numbers in the third column would match those in the first, rather than the second. Instead, the First Plan shows that the Debtor intended to cram down the Bank's "$1,151,648.96" claim to "$1,151,648.00" and its "$75,590.00" claim to "$72,593.19," an action accomplished only through a valuation under § 506. *See In re Shook*, 278 B.R. at 822 ("Section 506(a) provides for the bifurcation of an allowed claim into its secured and unsecured components *according to the value of the collateral*." (emphasis added)). This bifurcation, which was expressly provided in the plan, directly contradicts any alleged intention to pay secured claims in full and to disregard any stated valuations.

Under the "Security (Value)" column, the Debtors affirmatively listed the values for the Real Property and Personal Property securing the Bank's claims. This was clear and unambiguous, and the Debtors now cannot argue that any issue regarding the value of collateral was not considered at confirmation of the First Plan. Thus, if not for the Debtors' voluntary dismissal, the valuations contemplated by them in the First Plan would have had res judicata effect in the First Case, and that would have precluded the Debtors from complaining about an adverse result produced by their own plan.

> d. *The Timing of the Debtors' Voluntary Dismissal and Second Petition Amounts to Egregious Behavior.*

Although the value of collateral in the First Plan would have been entitled to res judicata effect during the First Case, no preclusive effect would be given to those valuations in the Second Case in light of the dismissal of the first. *See In re Nash*, 765 F.2d at 1413; *see also Gold Coast Asset Acquisition, L.P. v. 1441 Veteran St. Co. (In re 1441 Veteran St. Co.)*, 144 F.3d 1288, 1292 (9th Cir. 1998) ("It follows that when the purpose behind a particular valuation no

longer exists, that valuation becomes irrelevant."). While the requirements have not been satisfied to apply res judicata in the Second Case, the court may nonetheless rely on principles of res judicata in making a bad faith determination here since res judicata would have barred the Debtors from revaluing collateral during their earlier case but the binding and preclusive effect of their plan was vacated by the Debtors' *own decision to voluntarily dismiss their case.*

Having established that the res judicata would have barred the Debtors from proposing a modified plan in the First Case in order to revalue collateral, their attempt to do the same through a new plan in the Second Case suggests that they were attempting to bypass the binding and preclusive effect of their original valuations given the timing of the relevant events. Such a backdoor attempt would establish a bad faith filing if the Debtors' actions in both dismissing and immediately refiling were planned and intentional. As noted above, bad faith may be evidenced by the presence of egregious behavior by the debtor, but this does not require fraudulent intent. *See In re Leavitt*, 171 F.3d at 1224 (citations omitted). Here, the court concludes that the Debtors' action were calculated, rising to the level of egregiousness to sufficiently establish bad faith.

The court can infer from the sequence of events in both cases that the Debtors' actions were calculated and thus intended to circumvent the adverse, preclusive effect of the First Plan. First, in filing their Second Case, the Debtors acknowledged that they had a new overall bankruptcy strategy where they would "strip liens and eliminate the [s]wap agreement with [the] Bank," something that the Debtors failed to take advantage of in the First Case. This new strategy was developed by their new counsel. However, this was not developed *after* the First Case was dismissed, but rather it most likely occurred before, given that the Debtors employed their new counsel *during the First Case.* And before the court entered an order approving employment, their counsel's first order of business was to file a motion to dismiss the case.

Rather than attempt to propose some sort of modified plan, the Debtors' present counsel likely knew that the only way to avoid the binding effect of the First Plan was to dismiss the First Case and refile a new petition, because such dismissal would effectively vacate the First Plan. Indeed, the response to the Bank's Motion states that the Debtors "*had no choice but to move to*

17

*dismiss . . . and to refile* a new petition so as to schedule [their] debts in a way that would give [them] a reasonable opportunity to save [their] property and herd." Debtor's Response to Bank of America's Motion to Dismiss at 5, *In re Cabral (II)*, Case No. 12-12050-A-12 (Bankr. E.D. Cal. 2012) (emphasis added), ECF No. 105. Additionally, the Debtors have offered no other purpose for their immediate second filing other than to avoid the consequences of their confirmed First Plan because they were "not fully informed of or appraised of the benefits . . . of legally stripping liens and terminating the swam agreement with Bank of America" in the First Case. *Id.* at 9. The only way for them to do this was to somehow get rid of the First Plan that they had vigorously pursued towards confirmation against the many objections of the Bank.

Based on the timing of these events, the court can infer that the Debtors's dismissal and refiling were two intentional and coordinated actions that were part of their new bankruptcy strategy to abandon their old plan and then propose a new one. And since the Debtors *voluntarily* dismissed the previous case after confirmation (which vacated the First Plan) and then *immediately* filed their second in an effort to circumvent the binding and preclusive effect of the First Plan, the court finds that their calculated actions rise to the level of egregiousness and amount to a manipulation of the Bankruptcy Code. Under the circumstances, this constitutes a petition filed in bad faith.

### 3. The Debtors' Case Does Not Fall Under the Exception for Unforeseen Change in Circumstances.

To the benefit of many debtors, there is a "good faith" exception to the prohibition against a successive bad faith filing. A "second plan [in a second case] may modify the first plan [from the first case] where there has been an unforeseeable or unanticipated change in circumstances." *In re Caviata Attaches Homes*, 2012 WL 3002573, at *11; *see also In re Metz*, 820 F.2d at 1498 ("Such a bona fide change in circumstances is precisely what the bankruptcy [court] should examine to determine whether successive filings are proper."); *Elmwood Dev. Co. v. Gen. Electric Pension Trust (In re Elmwood Dev. Co.)*, 964 F.2d 508, 511–12 (5th Cir. 1992) ("[A] second petition would not necessarily contradict the original proceedings because a legitimately varied and previously unknown factual scenario might require a different plan to

18

accomplish the goals of bankruptcy relief."). But "for the bankruptcy court to consider a debtor's second . . . filing and plan, the unforeseeable or unanticipated change in circumstances must have affected the debtor's ability to fully perform under its confirmed plan." *In re Caviata Attaches Homes*, 2012 WL 3002573, at \*11.

Though this exception would grant a debtor a second chance, a debtor's successful showing of unforeseen changed circumstances to warrant the second filing is "clearly the exception rather than the rule." *Id.* at \*12 (concluding that continued depression of real estate and lending markets was not unforeseeable); *see, e.g., id.* at \*11 (citing "change in federal law affecting tenancy of an apartment building, termination of service by major airlines . . . , lost crops due to hail, cattle and pasture lost due to fire, and substantial adverse judgments" as examples of unforeseen changed circumstances).

This case is no exception. While the Debtors have identified several changes in circumstances, these changes were either foreseeable or they did not substantially impair the Debtors' ability to perform under the First Plan. Therefore, the court finds that the exception for an unforeseen change in circumstances does not apply in the Debtors' case.

The Debtors cited exhaustion of feed, drop in milk production, and loss of their two sons as workers as changed circumstances,[22] but they did not show the requisite causation, meaning how these circumstances significantly impacted their ability to perform under the First Plan. That is simply because they were not the actual, primary cause for the Debtors' immediate defaults under the plan.

Rather, the Debtors' failure to make the monthly plan payments was a direct result of their more immediate obligation to cure the defaults under the prior cash collateral order. The Debtors had expected to make monthly payments of only $20,000 under the plan, something that they believed to be feasible. However, they were caught off guard by the court's confirmation order where they were ordered to pay an additional $47,137.80 within three months of

---

[22] Though the court sustained the Bank's evidentiary objection to the Declaration, the court finds even if considered, the Declaration is insufficient to deny the Bank's Motion.

confirmation, an obligation to be performed on top of their normal plan payments. Since they had to commit essentially all of their income to these cure payments, the Debtors had nothing left to pay on their other obligations, including the monthly plan payments. As acknowledged by Antonio Cabral in the Declaration, this "change" was the true catalyst that inevitably led to the failure of the First Plan.

Though this "unexpected" cure obligation substantially impaired the Debtors' ability to perform under the First Plan, it still does not warrant their second bankruptcy filing. This was something that the Debtors could have foreseen—even *before* confirmation. They attempt to shift the blame onto the court for "pil[ing] the extra delinquent interest payments on [them]," but the fault clearly lies with them. The Debtors should have anticipated that their continued delinquency on court-ordered payments over an eight-month period could only result in another order requiring them to pay the unpaid arrearages immediately after confirmation. While the cure payments did represent a change in their circumstances, the change was brought on by the Debtors' own inability to maintain their ongoing obligations during the bankruptcy. This was clearly foreseeable and anticipated, so the Debtors cannot now claim that such changed circumstances justify their filing a second petition. As a result, the court concludes that their second petition still constitutes a bad faith filing.

C. The Debtors' Miscellaneous Defenses to the Motion.

The court now considers the remaining arguments advanced by the Debtors but finds none of them to be meritorious.

1. **The Debtors Are Bound by the Actions and Inactions of Their Former Counsel.**

That the Debtors should not be bound by their former counsel's alleged ignorance and failure to value collateral and strip liens in the First Case is an unavailing argument. The Debtors "voluntarily chose this attorney as [their] representative in the action, and [they] cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Link v. Wabash R. Co.*, 370 U.S. 626, 633–34 (1962). "Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his

20

1  lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon

2  the attorney." *Id.* at 634 (citation omitted) (internal quotation marks omitted).

3      The Debtors freely selected their counsel to represent them in their First Case, and they,

4  through their counsel, were the proponents of their First Plan in that case, a plan they fought to

5  confirm over the objections by the Bank. They now cannot escape the consequences flowing the

6  actions or inactions of their former counsel, no matter how unfavorable those might be.

7          **2. The Equitable Doctrine of Laches Does Not Bar the Bank's Motion to**

8              **Dismiss.**

9      Next, the Debtors argue that the equitable doctrine of laches precludes the Bank from

10  moving to dismiss the Debtors' Second Case for cause since the filing of the Motion occurred

11  over four months after the petition was filed. The court disagrees.

12     Laches requires the presence of both inexcusable delay in the exercise of a known right

13  and prejudice to the other party as a result. *See In re Shook*, 278 B.R. at 830 (citing *Stevens*

14  *Tech. Servs., Inc. v. S.S. Brooklyn*, 885 F.2d 584, 588 (9th Cir. 1989)). "[L]aches is not a

15  doctrine concerned solely with timing. Rather, it is primarily concerned with prejudice." *In re*

16  *Beaty*, 306 F.3d 914, 924 (9th Cir. 2002). Here, the Debtors cannot establish either inexcusable

17  delay or prejudice.

18     First, in this particular instance, the lapse of four months after the petition date does not

19  constitute an inexcusable delay by the Bank. Without knowing what the Debtors were going to

20  propose in a plan (which was not filed until three months into the case), the Bank would have

21  had essentially no supporting evidence or arguments to successfully bring its Motion to dismiss

22  the case. Only with the contents of the Second Plan on file did the Bank have enough to

23  establish that the Debtors filed their second petition in bad faith. Also, the fact that the Bank

24  filed its Motion almost immediately following the Debtors' filing of the Second Plan shows that

25  the Bank acted diligently, rather than with any kind of delay.

26     Second, the Debtors have not shown how they have suffered any prejudice as a result of

27  the Bank's "delayed" Motion. They argue that if the Bank had filed its Motion immediately after

28  the petition was filed, they would have not incurred attorney's fees for the motions to value

21

collateral and the Second Plan subsequently filed after the petition. However, this was not at all prejudicial to the Debtors. Such fees are inevitable in a *reorganization* case under chapter 12 (as a plan and valuations are necessary to reorganization), unless the Debtors had no intention to propose and confirm a plan of reorganization the second time around. If anything, the Debtors have benefitted from such "delay." Since the Bank moved for dismissal four months after the second petition date, the Debtors have had the benefit of the automatic stay during that time, preventing the Bank from exercising its state law remedies against its collateral.

### 3. The Bank's Arguments May Be Raised in a Motion to Dismiss Rather Than Strictly Confined to an Objection to Plan Confirmation.

Lastly, the Debtors contend that the Bank's arguments regarding their plan being proposed in bad faith are inappropriately raised in a motion to dismiss and are better suited in an objection to confirmation. Arguably, since the Debtors could theoretically propose an amended plan, one that would contain only provisions proposed in good faith, the court should not consider Bank's arguments at this time. Again, the court does not agree.

The court may look to the debtor's proposed second plan in determining whether bad faith exists to dismiss the second petition since the proposed plan can offer insight into the debtor's reason for filing. *See In re Eisen*, 14 F.3d at 470; *In re Metz*, 820 F.2d at 1498. That was clearly the case here.

And even if the court were to grant the Debtors a second chance with an amended plan in this case, there would nevertheless be cause for dismissal. For any amended plan in the Second Case to constitute a plan proposed in good faith, the plan would have to resemble something that was modifiable and not barred by res judicata in the First Case. If such a plan were proposed, bad faith still exists due to the fact that the Debtors exercised their absolute right to dismiss their First Case. What would make that a case of bad faith is that the Debtors received the benefit of the automatic stay in the Second Case without having to perform any obligations under any plan because they chose to voluntarily dismiss their First Case, which effectively vacated their First Plan. If there was an appropriate time for the Debtors to file a plan, it would have been during the First Case after confirmation as part of a plan modification.

22

**IV. CONCLUSION.**

The Debtors in the Second Case seek to value overencumbered collateral secured by the Bank's claims and to lien strip any of the Bank's undersecured claims accordingly. Since the Debtors in the First Case had already valued that collateral at confirmation of the First Plan, they would have been precluded from revaluing collateral by a later plan modification during the First Case based on principles of res judicata. And because res judicata would have acted as a bar to revaluation, their attempt to essentially do the same but in the Second Case—after exercising their absolute right to voluntarily dismiss the First Case—constitutes a manipulation of the Bankruptcy Code. Under the totality of the circumstances, the court finds that the Debtors' second petition was filed in bad faith. Such bad faith represents sufficient cause for dismissal. Therefore, the court will dismiss the Debtors' present chapter 12 case.[23]

Dated: October **10** , 2012

Fredrick E. Clement
United States Bankruptcy Judge

---

[23] In its Motion, the Bank also requested that the court impose a 180-day bar against refiling. Other than a single reference to § 349(a) and a prayer for that relief, the Bank failed to substantively address the issue in its Motion. Therefore, the court cannot grant the relief requested.

service list for Cabral:

Thomas O. Gillis, Esq.
1006 H St., #1
Modesto, CA 95354

M. Nelson Enmark
Chapter 12 Trustee
3855 N. West Ave., Suite 108
Fresno, CA 93705

David K. Eldan, Esq.
555 S. Flower St., 30th Floor
Los Angeles, CA 90071-2440

Office of the United States Trustee
2500 Tulare Street
Suite 1401
Fresno, California 93721